# EXHIBIT A

JOHN W. HUBER, United States Attorney (#7226)
JOHN K. MANGUM, Assistant United States Attorney (#2072)
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
Email: john.mangum@usdoj.gov

ERIN HEALY GALLAGHER, *pro hac vice* motion pending
DC Bar No. 985670, erin.healygallagher@usdoj.gov
ERIN R. HINES, *pro hac vice* motion pending
FL Bar No. 44175, erin.r.hines@usdoj.gov
CHRISTOPHER R. MORAN, *pro hac vice* motion pending
NY Bar No. 5033832, christopher.r.moran@usdoj.gov
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-2452

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAPOWER-3, LLC, INTERNATIONAL AUTOMATED SYSTEMS, INC., LTB1, LLC, R. GREGORY SHEPARD, NELDON JOHNSON, and ROGER FREEBORN,<br><br>Defendants. | Civil No. 2:15-cv-00828 DN<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>Judge David Nuffer |

Plaintiff, the United States of America, for its complaint against Defendants RaPower-3,

LLC, International Automated Systems, Inc., LTB1, LLC, R. Gregory Shepard, Neldon Johnson,

and Roger Freeborn (collectively, "Defendants"), states as follows:

1

## Nature of Action

1.     The United States brings this complaint pursuant to 26 U.S.C.[1] §§ 7402 and 7408 to enjoin Defendants, and any other person or persons in active concert or participation with them, from, among other things:

a.     organizing, promoting, or selling the "solar energy scheme" described herein, or any other plan or arrangement, that advises or assists customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities;

b.     making false statements, in connection with such organizing, promoting, or selling, about the allowability of any federal tax benefit as a result of participating in the plan or arrangement;

c.     making or furnishing gross valuation overstatements in connection with such organizing, promoting, or selling;

d.     preparing or assisting in the preparation of any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS, claiming tax benefits resulting from the solar energy scheme described herein;

e.     preparing or assisting in the preparation of any federal tax return, or any document that may be filed in support of a tax return or other submission to the IRS, claiming tax benefits for any person or entity other than themselves or an entity in which they own an interest; and

---

[1] All statutory references are to the Internal Revenue Code ("I.R.C."), 26 U.S.C., unless otherwise noted.

2

     f.      engaging in other conduct that substantially interferes with the proper

administration and enforcement of the internal revenue laws.

2.     Further, pursuant to § 7402, the United States seeks an order requiring, among other

things, that:

     a.      Shepard, Johnson, and Freeborn advise the IRS through its designee of any entity

formed by him or at his direction no later than 30 days from the date of the entity's

formation; and

     b.      all Defendants disgorge to the United States the gross receipts that they received

from any source as a result of the solar energy scheme described herein, together with

prejudgment interest thereon.

## Authorization

3.     This action has been requested by a delegate of the Secretary of Treasury and

commenced at the direction of a delegate of the Attorney General of the United States.

## Jurisdiction and Venue

4.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345, and I.R.C.

§ 7402(a).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to the claims herein occurred in the District of Utah.

6.     Venue is proper pursuant to I.R.C. § 7408(a) because, as alleged herein, Defendants

engaged in conduct subject to penalty under § 6700 in the District of Utah.

3

## Parties

7.     Plaintiff is the United States.

8.     RaPower-3, LLC ("RaPower-3") is a Utah corporation, with a registered agent address of 4035 South 4000 West, Deseret, UT 84624.

9.     International Automated Systems, Inc. ("IAS") is a Utah corporation, with a registered agent address of 55 North Merchant Street 608, American Fork, Utah, 84003.

10.    LTB1, LLC ("LTB") is a Nevada corporation, with a registered agent address of 3835 Broadmead Street, Las Vegas, Nevada, 89147. A substantial part of the events and omissions that give rise to the claims stated against LTB occurred in the District of Utah.

11.    R. Gregory Shepard is a resident of the state of Utah. Further, his actions that give rise to this complaint occurred in and around Utah. At all times relevant to this complaint, Shepard acted on behalf of RaPower-3 as a manager, director, and/or officer. All of the material on RaPower-3's website was created by Shepard.

12.    Neldon Johnson is a resident of the state of Utah. Further, his actions that give rise to this complaint occurred in and around Utah. At all times relevant to this complaint, he was a manager, officer, and/or director of RaPower-3, IAS, and LTB.

13.    Roger Freeborn is a resident of the state of Oregon. During times relevant to this complaint, he was a "National Director" of RaPower-3. A substantial part of the events and omissions that give rise to the claims stated against Freeborn occurred in, arose out of, or were directed toward the District of Utah.

4

**Defendants' abusive solar energy scheme.**

14.     Since at least 2010, and continuing to the present, Defendants have promoted an abusive

tax scheme that results in their customers claiming federal income tax deductions and credits to

which the customers are not entitled, and which enriches Defendants at the expense of the United

States Treasury.

15.     Defendants use their own websites (*e.g.*, www.rapower3.com and www.iaus.com) and

social media sites to promote their abusive scheme. Defendants give teleconferences and in-

person presentations to potential customers about the scheme. They also use a multi-level

marketing model to attract new customers.

16.     Defendants claim that IAS owns certain technology that offers a "disruptive" and

"revolutionary" approach to capturing and using solar energy to help make "America energy

independent."

17.     This technology purportedly involves "solar thermal lenses" on IAS "solar towers."

18.     IAS owns a parcel of land in Millard County, Utah ("Installation"), on which Defendants

have placed fewer than 25 "solar towers."

19.     Each "solar tower" has, at most, approximately 68 "lenses" mounted at the top.

20.     According to Defendants, the lenses use solar energy and, with the other infrastructure at

the Installation, generate "process heat temperatures of over 1,000 degrees F" and electricity.

21.     Defendants feature photos and videos purporting to show the "technology" in testing

and/or in operation on their websites and on social media sites like Tumblr and YouTube.

22.     Johnson allegedly invented the "technology" that IAS claims to possess and that

Defendants promote.

5

23. IAS gives "RaPower[-]3 the right to sell [its] lenses."

24. RaPower-3 solicits customers to purportedly buy the solar lenses from RaPower-3.

25. When the customer signs a purchase agreement with RaPower-3, purportedly to buy solar lenses, the customer also signs an "operation and maintenance agreement" with LTB and may also sign a "bonus referral contract" with RaPower-3.

26. RaPower-3 provides all three agreements to potential customers.

27. Under the purported lens purchase agreement, the price for each lens is $3,500.

28. Johnson, as "Director" of RaPower-3, signs the operation and maintenance agreements that purportedly bind LTB.

29. At no cost, according to RaPower-3, LTB "installs, operates and maintains [the customer's] lenses" at the Installation or elsewhere, ostensibly to generate energy using solar power.

30. Therefore, according to RaPower-3, a customer need not worry about the "hassle" of operating and maintaining the lenses.

31. According to the operation and maintenance agreement, once the customer's lenses are installed and purportedly producing revenue (ostensibly by generating energy using solar power), LTB will make quarterly or annual "rental payments" to the customer for using the lenses in the amount of $150 total per year.

32. The so-called "bonus referral contract" purportedly entitles the customer to an infinitesimal percentage of IAS's "gross revenue" in exchange for the customer's agreement to make the lenses "available to IAS as a reference for marketing and sales purposes" to entice new customers to buy in to the scheme.

6

33.     According to Defendants, the combination of the three agreements – the purchase agreement, the operation and maintenance agreement, and the bonus referral contract – gives a customer the right to claim the tax benefits Defendants promote: depreciation and other business-related expenses and the § 48 solar energy credit.

34.     According to Defendants, the lenses need not actually be in use as solar-energy-producing equipment for the customer to claim the tax benefits Defendants promote. Instead, the customer purportedly "leases out" the lenses through the operation and maintenance agreement. By holding the lenses out for lease, according to Defendants, the customer may claim the promoted tax benefits.

35.     Defendants' customers typically "buy" multiple lenses per year; some even purportedly purchase more than one hundred lenses in a particular tax year.

36.     Defendants also encourage their customers to "sponsor" more taxpayers to buy lenses through a multi-level marketing model. In fact, some of Defendants' customers have recruited others to buy into the scheme, in exchange for a commission. For example:

        a.      Person A, a Utah resident, claimed to have sold 400 to 500 lenses as of January 2013. He earned commission of 10 percent of the $1,050 down payment for each lens he sold.

        b.      Defendants' customer Person B is the "sponsor" for Defendants' customers Person C, Person D, and Person E. All are Florida residents. According to the "success stories" on RaPower-3's website in 2013, Person B has "signed many, many new RaPower[-]3 Team Members."

7

c. Defendants' customer Person F is the "sponsor" for Defendants' customer Person

G. Person F is a resident of Washington and Person G is a resident of Alaska.

37. Shepard "sponsors" customers into this abusive scheme. He claims to have earned more

than $170,000 from 2010 through 2013 due to activities related to promoting the scheme.

38. From his activities related to promoting this abusive tax scheme, Johnson claims to have

earned nearly $500,000 in tax years 2012 and 2013 alone.

39. Freeborn "sponsors" customers into this abusive scheme. For his activities related to

promoting this abusive tax scheme, RaPower-3 paid him more than $100,000 from 2011 through

2013.

40. In March 2015, RaPower-3 and Shepard stated "RaPower[-]3 should expand its member

base by thousands of new members. So expect them to also be claiming tax benefits."

## Defendants' customers are not entitled to the tax benefits that Defendants promote, and Defendants know or have reason to know it.

41. Because Defendants' scheme centers on purported solar energy technology, hereafter the

scheme will be referred to as the "solar energy scheme."

42. Defendants induce customers to rely on their representations about the tax benefits of the

solar energy scheme by providing customers a letter from Anderson Law Center, P.C., of Delta,

Utah, and a memorandum from the law firm Kirton McConkie, of Salt Lake City, Utah. Johnson

obtained both the Anderson letter and the Kirton McConkie memorandum.

43. But neither the Anderson letter nor the Kirton McConkie memorandum support

Defendants' assertions about the tax benefits of their solar energy scheme because, among other

reasons, the facts of the solar energy scheme as Defendants know them are different than the

facts stated and assumed in the letter and memorandum.

8

44.    Defendants' customers are not entitled to the deductions they claim for "business" expenses, including depreciation, nor are they entitled to the § 48 energy credit, and Defendants know or have ample reason to know it.

*Defendants' purported solar technology is a sham.*

45.    Defendants know, or have reason to know, that they do not have operational, or even nearly operational, technology that would employ the lenses they have "sold" to use solar energy to generate electricity, to heat or cool (or provide hot water for use in) a structure, or to provide solar process heat for any purpose that Congress intended to encourage through tax deductions or credits.

46.    Defendants know, or have reason to know, that they do not have the appropriate permits from Millard County for the production of solar energy on the Installation.

47.    Defendants' "lenses" consist of thin sheets of plastic.

48.    There are some lenses mounted on towers at the Installation in Millard County.

49.    The thin plastic lenses that have been mounted have been exposed to desert conditions. Many are broken and dangling out of their frames. The ground near the Installation is littered with shards of plastic from lenses which have broken and fallen.

50.    In this state, the lenses cannot capture or direct sunlight such that it could be used for any purpose that Congress intended to encourage through tax deductions or credits.

51.    The vast majority of lenses purportedly sold – if they even exist – have not been mounted. Defendants claim that the lenses are in storage.

9

52.     Defendants' customers have not been able to identify which lenses purportedly belong to

them, as opposed to lenses that purportedly belong to other customers. They have not been able

to identify whether their lenses have been prepared for installation, are in storage, are mounted

on the towers, or have fallen off of the towers and into the desert.

53.     Even if the lenses could somehow focus the sunlight to generate energy, the towers and

other infrastructure on the Installation are in a state of such disrepair that such energy could not

be collected and used for any purpose that Congress intended to encourage.

54.     On information and belief, even if the infrastructure on the Installation were in a state of

good repair, it would not actually generate useable solar energy.

55.     In short, Defendants' purported "disruptive" and "revolutionary" technology is a sham.

*The financial structure of Defendants' solar energy scheme is a sham and*
*lacks economic substance.*

56.     Furthermore, the transactions that Defendants use to implement their abusive solar energy

scheme lack economic substance and show that they know that their customers are not engaged

in a trade or business related to the scheme and are not producing income from any legitimate

trade or business related to the scheme.

57.     For example, RaPower-3 does not require a customer to pay the full $3,500 purchase

price for each lens at the time the customer signs the purported purchase agreement.

58.     Instead, RaPower-3 allows a customer to pay $1,050 as a "down payment" for each lens.

59.     But only $105 per lens is due to RaPower-3 within 15 days of signing the purchase

agreement.

60.     The remaining $945 is due to RaPower-3 in the following year, only *after* the customer

has received the "tax refunds/savings" from buying in to Defendants' solar energy scheme.

10

61. Thus, 90 percent of a typical customer's down payment to RaPower-3 for a "lens" is funded by a wrongful refund paid out by the United States Treasury to the customer.

62. RaPower-3 itself "[f]inance[s] the rest" of the $2,450 difference between the $1,050 "down payment" and the full $3,500 price of each lens.

63. The lens itself is the only "collateral" that RaPower-3 takes as security for the $2,450 difference between the "down payment" and the full price of each lens.

64. RaPower-3 applies a mere 1 percent "simple interest" on the remaining $2,450, for a term of 30 to 35 years, which results in an annual payment from the customer of $82.

65. According to the purported purchase agreement, a customer is not obligated to pay the $82 annual payment until after the lens has been "installed and producing revenue" for at least five years.

66. The customer is not personally liable for the remaining $2,450. There is no provision for remedy in case a customer defaults, other than "repossession" of the lens by RaPower-3.

67. On information and belief, no lens has produced rental income for any customer.

68. On information and belief, the purported debt for the remaining $2,450 is a sham, designed to inflate a customer's stated purchase price to enable the customer to claim large tax benefits as a result of buying "lenses" or otherwise participating in Defendants' solar energy scheme.

69. Because most of the purchase price of the lens is funded with erroneous tax benefits and RaPower-3's so-called "financing," Defendants' customers do not actually have to pay "out of pocket" to participate in the solar energy scheme. Instead, the tax benefits that a customer claims from participating will more than pay for the customer's "down payment" for all lenses.

11

70.     In fact, RaPower-3 "recommend[s] that you look at the taxes you paid last year and what you expect to pay this year in determining how many solar thermal lenses you should buy." By using RaPower-3's online calculator (or following RaPower-3's detailed calculation instructions, also online), RaPower-3 claims that "you may be able to zero out your taxes while maximizing your solar business."

71.     Because Defendants claim that customers' taxes can be "zeroed out" through the solar energy scheme, Defendants have encouraged customers to either reduce or eliminate their federal income tax withheld by their employers or their quarterly self-employment tax payments.

72.     In 2013, RaPower-3 touted "success stories" on its website. None of the "success stories" involved the actual production of solar energy. Rather, all of the so-called "success stories" involved customers receiving the substantial tax benefits that Defendants promote.

73.     RaPower-3 said "WHETHER YOU MAKE TONS OF MONEY [OR] JUST A LITTLE; EVERYONE MAKES MONEY WITH RAPOWER[-]3 AS LONG AS YOU ARE A TAXPAYER."

74.     One reason that "EVERYONE MAKES MONEY WITH RAPOWER[-]3 AS LONG AS YOU ARE A TAXPAYER" is that Defendants use the full $3,500 purchase price for each lens as the starting point for computing tax benefits like the depreciation expense deduction and the § 48 energy credit for which their customers purportedly qualify.

75.     But the actual cost to IAS for each "lens" is less than $1,000.

12

76. In light of their knowledge about all of the facts above and the applicable tax law, Defendants know, or have reason to know:

a. under the proper circumstances, the Internal Revenue Code allows a taxpayer engaged in a trade or business certain tax deductions for expenses the taxpayer incurs while generating income. One such deduction is for depreciation, the "wear and tear" on property either acquired for use in the taxpayer's "trade or business" or held by the taxpayer "for the production of income." Other allowable deductions are "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on [the taxpayer's] trade or business";

b. participating in Defendants' solar energy scheme does not create a legitimate "trade or business" for any customer, either one related to the lenses that customers purportedly purchase through the scheme or any other trade or business related to the scheme. To be allowed a deduction for depreciation or for ordinary and necessary business expenses, a taxpayer must have undertaken activity in a "trade or business" or "for the production of income" in good faith, with the primary purpose of the activity to make a profit. The taxpayer's activity must have economic substance and not be entered into solely for the tax benefits. But Defendants promote and execute the solar energy scheme such that it lacks any requirement that customers engage in good faith, profit-motivated activity in a "trade or business" or "for the production of income." The scheme does not and will not produce income for customers (other than unwarranted tax benefits), either from the production of energy or through a legitimate business. Instead, the solar energy scheme lacks economic substance. Defendants induce customers to buy

13

in to their solar energy scheme solely to obtain tax benefits (which wrongfully enrich Defendants) and not to change their customers' substantive economic position;

c.      even if customers could qualify as being in a "trade or business" by buying in to Defendants' solar energy scheme, their customers did not materially participate in that trade or business. A taxpayer "materially participates" in an activity only if the taxpayer's involvement in the activity is regular, continuous, and substantial. If the taxpayer does not "materially participate" in a trade or business, the taxpayer may offset losses from the trade or business only against income the taxpayer earns from other passive activity. Defendants promote and execute the solar energy scheme in a way that their customers are not required to "materially participate" in any activity related to the scheme;

d.      Defendants' solar energy scheme is designed to avoid, and does avoid, putting their customers "at risk" for the purported full purchase price of their lenses. Whether or not a taxpayer is in a "trade or business," an individual (among other qualified taxpayers) may be allowed to deduct losses from certain activity up to the amount that the taxpayer has "at risk" in the activity. The amount "at risk" is the amount of money that the taxpayer could lose in the activity, and includes money and property that the taxpayer contributes to the activity. A taxpayer is *not* "at risk" for amounts in an activity that the taxpayer borrows from "any person who has an interest in such activity" or is related to such an interested person; and

e.      the lenses are not "energy property" for purposes of the § 48 energy credit. Among other qualifying requirements, "energy property" means equipment with respect to which depreciation is allowed, and "which uses solar energy [1] to generate electricity,

14

[2] to heat or cool (or provide hot water for use in) a structure, or [3] to provide solar

process heat." Defendants promote and execute the solar energy scheme in a way that

customers may not depreciate the lenses they purportedly purchase. Further, neither the

lenses, nor any other equipment on the Installation, are (or have been) generating

electricity, heating or cooling a structure, providing hot water for use in a structure, or

providing solar process heat.

77.     Accordingly, Defendants know or have reason to know that their customers are not

entitled to claim the tax benefits that Defendants promote through their solar energy scheme.

### As a direct result of Defendant's abusive solar energy scheme and Defendants' false or fraudulent statements, their customers claimed and received tax benefits that they were not entitled to receive.

78.     In reliance on Defendants' claims, and as a result of buying into Defendants' abusive

solar energy scheme, their customers have failed to file proper federal income tax returns. This

has deprived the United States of tax revenue owed by Defendants' customers.

79.     The tax returns filed by Defendants' customers Person H and Person I, Utah residents and

a married couple who filed jointly each year described below, provide an example of the abusive

nature of Defendants' solar energy scheme and the harm to the government that it causes.

Person H and Person I participated in Defendants' solar energy scheme during tax years 2010,

2011, 2012, and 2013.

80.     For Person H and Person I's tax return for tax year 2012:

    a.      Person H purportedly purchased at least 160 lenses from RaPower-3 in tax year

    2012.

15

b.     Shepard, on behalf of RaPower-3, sent Person H a letter stating that these lenses were placed in service in tax year 2012 and that this would "qualify [Person H] for the ... solar energy tax credit."[1]

c.     Person H and Person I reported $161,963 in wages, salaries, and tips from W-2s on their tax return.

d.     On their tax return, Person H and Person I claimed a Schedule C business loss of $281,692 from Person H's purported business involving "utilities" and called "Ra Power 3." The total amount of the claimed loss from the "utilities" business resulted from $0 in income, but more than $281,692 in "expenses" including more than $280,000 in so-called depreciation due to the lenses Person H purportedly purchased through Defendants' solar energy scheme.

e.     This claimed loss reduced Person H and Person I's adjusted gross income by $281,692.

f.     Due to this false business loss, and in light of other income and deductions Person H and Person I applied, they claimed on their return that their taxable income was $57,646.

g.     Person H and Person I's claimed tax on $57,646 in taxable income was $7,774, according to their return.

h.     Person H and Person I claimed $7,774 in bogus § 48 energy credits to "zero out" their taxes on their return, as Defendants asserted that that they could.

_____

[1] RaPower-3, under Shepard's signature, routinely sends such letters to Defendants' customers. Before Shepard began sending these letters, Johnson sent identical (or nearly identical) letters on IAS letterhead.

16

i.      Due to the false claims on their 2012 income tax return, Person H and Person I
stated that they owed $0 in taxes.

j.      Because Person H and Person I had federal income tax withholdings of $43,857
during tax year 2012, they claimed a refund for that amount. The IRS erroneously paid
the refund.

k.      But Person H and Person I were not entitled to the tax benefits that they claimed
for tax year 2012 for the reasons described herein.

81.     For Person H and Person I's tax return for tax year 2013:

a.      Person H and Person I reported $144,309 in wages, salaries, and tips from W-2s
on their tax return.

b.      On their tax return, Person H and Person I claimed a Schedule C business loss of
$89,852 from Person H's purported business involving "equipment leasing" and called
"Ra Power 3." The total amount of the claimed loss from the "equipment leasing"
business resulted from $0 in income and $89,852 in so-called depreciation on lenses
Person H purportedly purchased.

c.      This purported loss offset the $51,806 in business income from Person H's
"healthcare" business and resulted in a total reported Schedule C business loss for
Person H and Person I in the amount of $38,046.

d.      Due to this false business loss, and in light of other income and deductions
Person H and Person I applied, they claimed on their return that their taxable income was
$200,468.

17

e. Person H and Person I's claimed tax on $200,468 in taxable income was $43,597, according to their return.

f. Person H and Person I claimed $38,945 in bogus §48 energy credits to greatly reduce their tax liability on their return, as Defendants asserted that they could.

g. Due to the false claims on their 2013 income tax return, and in light of other taxes they applied, Person H and Person I claimed that they owed $6,236 in taxes.

h. Because Person H and Person I had federal income tax withholdings of $43,800 during tax year 2013, they claimed a refund for $37,564. The IRS erroneously paid the refund.

i. But Person H and Person I were not entitled to the tax benefits that they claimed for tax year 2013 for the reasons described herein.

82. The tax returns filed by Defendants' customers Person J and Person K, Minnesota residents and a married couple who filed jointly each year described below, provide another example of the abusive nature of Defendants' solar energy scheme and the harm to the government that it causes. Person J and Person K participated in Defendants' solar energy scheme during tax years 2010, 2011, 2012, and 2013.

83. For Person J and Person K's tax return for tax year 2010:

a. Person J purportedly purchased at least 12 lenses from RaPower-3 in tax year 2010.

b. Person J and Person K reported $148,070 in wages, salaries, and tips from W-2s on their tax return.

18

c.     On their tax return, Person J and Person K claimed a Schedule C business loss of \$30,600 from Person J's unnamed purported business involving "sales: energy." The total amount of the claimed loss from the "sales: energy" business resulted from \$0 in income, but more than \$30,600 in "expenses," all of which came from so-called depreciation on the lenses Person J purportedly purchased through Defendants' solar energy scheme.

d.     Due to this false business loss, and in light of other income and deductions Person J and Person K applied, they claimed on their return that their taxable income was \$81,313.

e.     Person J and Person K's claimed tax on \$81,313 was \$12,694, according to their return.

f.     Person J and Person K claimed \$10,800 in bogus § 48 energy credits to nearly eliminate their tax liability on their return, as Defendants asserted that they could.

g.     Due to the false claims on their 2010 income tax return, and in light of other taxes they applied, Person J and Person K stated that they owed \$374 in taxes.

h.     Person J and Person K had federal income tax withholdings of \$16,590 during tax year 2010. When they combined this withheld tax with additional credits, they claimed a refund of \$18,016. The IRS erroneously paid the refund.

i.     But Person J and Person K were not entitled to the tax benefits that they claimed for tax year 2010 for the reasons described herein.

84.     For Person J and Person K's tax return for tax year 2011:

a.     Person J purportedly purchased at least 75 lenses from RaPower-3 in tax year 2011.

19

b.      Shepard, on behalf of RaPower-3, sent Person J a letter stating that these lenses were placed in service in tax year 2011, which would "qualify [Person J] for the . . . solar energy tax credit."

c.      Person J and Person K reported $160,481 in wages, salaries, and tips from W-2s on their tax return.

d.      On their tax return, Person J and Person K claimed a Schedule C business loss of $223,193 from Person J's unnamed purported business involving "sales: solar energy." The total amount of the claimed loss from the purported "sales: solar energy" business resulted from $126 in income and a so-called loss of $223,193 which included a "depreciation" expense of $223,125 for the lenses Person J purportedly purchased.

e.      Due to this false business loss, and in light of other income and deductions Person J and Person K applied, they claimed on their return that their taxable income was $0.

f.      Person J and Person K's claimed tax on $0 was $0, according to their return.

g.      Person J and Person K did not claim any bogus § 48 energy credits on their return for tax year 2011 because their tax obligation was already "zeroed out" by their claimed depreciation expense.

h.      Person J and Person K had federal income tax withholdings of $15,263 during tax year 2011. When they combined this withheld tax with additional credits they applied, Person J and Person K claimed a refund of $17,263. The IRS erroneously paid the refund.

i.      But Person J and Person K were not entitled to the tax benefits that they claimed for tax year 2011 for the reasons described herein.

85.    For Person J and Person K's tax return for tax year 2012:

a.    Person J purportedly purchased at least 23 lenses from RaPower-3 in tax year 2012.

b.    Shepard, on behalf of RaPower-3, sent Person J a letter stating that these lenses were placed in service in tax year 2012, which would "qualify [Person J] for the . . . solar energy tax credit."

c.    Person J and Person K reported $153,550 in wages, salaries, and tips from W-2s on their tax return.

d.    On their tax return, Person J and Person K claimed a Schedule C business loss of $34,182 from Person J's unnamed purported business involving "sales: solar energy." The total amount of the claimed loss from the purported "sales: solar energy" business resulted from $2,962 in income and so-called "expenses" of $37,144 which included a "depreciation" expense of $35,924 for lenses Person J purportedly purchased through Defendants' solar energy scheme.

e.    Due to this false business loss, and in light of other income and deductions Person J and Person K applied, they claimed on their return that their taxable income was $79,276.

f.    Person J and Person K's claimed tax on $79,276 was $11,879, according to their return.

g.    Person J and Person K claimed $8,897 in bogus § 48 energy credits for tax year 2012, which, in addition to other credits they applied, "zeroed out" their tax obligation according to their return, as Defendants asserted they could do.

21

h.     Person J and Person K had federal income tax withholdings of $11,055 during tax

year 2012. When they combined this withheld tax with additional credits they applied,

they claimed a refund of $13,055. The IRS erroneously paid the refund.

i.     But Person J and Person K were not entitled to the tax benefits that they claimed

for tax year 2012 for the reasons described herein.

86.    For Person J and Person K's tax return for tax year 2013:

a.     Person J and Person K reported $132,972 in wages, salaries, and tips from W-2s

on their tax return.

b.     On their tax return, Person J and Person K claimed a Schedule C business loss of

$34,182 from Person J's unnamed purported business involving "sales: solar energy."

The total amount of the claimed loss from the purported "sales: solar energy" business

resulted from $6,993 in income and so-called "expenses" of $21,645, which included a

"depreciation" expense of $21,420 for lenses Person J purportedly purchased.

c.     Due to this false business loss, and in light of other income and deductions

Person J and Person K applied, they claimed on their return that their taxable income was

$87,501.

d.     Person J and Person K's claimed tax on $87,501 was $13,739, according to their

return.

e.     Person J and Person K claimed $12,239 in bogus § 48 energy credits for tax year

2013, which, in addition to other taxes and credits they applied, greatly reduced the tax

they owed to $156, according to their return.

22

     f.     Person J and Person K had federal income tax withholdings of \$8,288 during tax

year 2013. When they combined this withheld tax with additional credits they applied,

they claimed a refund of \$9,132. The IRS erroneously paid the refund.

     g.     But Person J and Person K were not entitled to the tax benefits that they claimed

for tax year 2013 for the reasons described herein.

87.    Defendants encourage customers to "purchase" more lenses than the customer actually

"needs" to zero out his or her tax liability for the current tax year by telling customers that

"excess" § 48 energy credits and depreciation expense losses can be carried back to prior tax

years and carried forward to future tax years.

88.    In fact, some of Defendants' customers filed amended tax returns to carry back the bogus

depreciation expense losses and/or § 48 energy credits they claimed as a result of buying in to

Defendant's abusive solar energy scheme.

89.    The false depreciation expense losses and/or § 48 energy credits that Defendants'

customers carried back to prior tax years reduced or "zeroed out" the tax they owed in those

years.

90.    But Defendants' customers are not entitled to the false depreciation expense losses and/or

§ 48 energy credits they carried back to prior tax years as a result of buying in to Defendants'

abusive solar energy scheme.

91.    Similarly, some of Defendants' customers have carried forward a false depreciation

expense loss and/or § 48 energy credits that they claimed as a result of buying in to Defendants'

abusive solar energy scheme.

23

92.    Defendants' customers are not entitled to the false depreciation expense losses and/or
§ 48 energy credits that they have carried forward into future tax years, or may attempt to carry
forward into future tax years.

93.    Defendants' customers Person L and Person M, Oregon residents and a married couple
who filed jointly each year described below, were "sponsored" into the solar energy scheme by
Freeborn. Their tax returns for 2011 and 2012, provide an example of the way that a wrongful
carried-forward depreciation expense loss causes harm to the government:

   a.    Person L purportedly purchased at least 26 lenses from RaPower-3 in tax year
   2011.

   b.    Shepard, on behalf of RaPower-3, sent Person L a letter stating that these lenses
   were placed in service in tax year 2011, which would "qualify [Person L] for the . . . solar
   energy tax credit."

   c.    Person L and Person M reported $46,422 in wages, salaries, and tips from W-2s
   on their tax return.

   d.    On their tax return, Person L and Person M claimed a Schedule C "solar energy"
   business loss of $76,870 largely as a result of the "depreciation" they claimed on the
   lenses Person L purportedly bought through Defendants' solar energy scheme.

   e.    Subtracting the Schedule C loss from their ordinary income, and applying other
   income and deductions, Person L and Person M claimed on their tax return that their
   adjusted gross income for tax year 2011 was negative $36,800.

   f.    Due to this false loss, and in light of other deductions Person L and Person M
   applied, they claimed taxable income of $0, according to their return. Accordingly,

24

Person L and Person M reported that their tax for 2011 was $0.

g.      Then, for tax year 2012, Person L and Person M reported $46,801 in wages, salaries, and tips from W-2s on their tax return.

h.      On their tax return, Person L and Person M claimed a Schedule C business loss of $2,170 from Person L's purported business involving "solar power" and called "Ra Power 3." The total amount of the claimed loss from the "solar power" business resulted from $1,055 in income, and $3,225 in "depreciation" on lenses Person L purportedly bought through Defendants' solar energy scheme.

i.      In addition, Person L and Person M claimed a "net operating loss" due to their negative $36,800 adjusted gross income from tax year 2011. Person L and Person M used this carried forward "net operating loss" to offset much of their remaining income, which resulted in their claimed adjusted gross income of $8,943.

j.      Due to these false losses, and in light of other income and deductions Person L and Person M applied, they claimed taxable income of $0, according to their return. Accordingly, Person L and Person M reported that their tax for 2012 was $0.

k.      But Person L and Person M were not entitled to the losses that they claimed for tax years 2011 and 2012 for the reasons described herein.

94.     Most of Defendants' customers, like the customers in the examples above, participated in the solar energy scheme for two, three, four, or more tax years to date. On information and belief, such customers continue to "buy" new lenses each year – in spite of not having received rental income from the lenses they "bought" in prior years – because they continue to avoid

paying tax on their income, and often receive large tax refunds to which they are not entitled, as a result of participating in Defendants' abusive scheme.

95.     Defendants' abusive solar energy scheme is designed to generate money for their customers from tax savings alone, regardless of the actual performance of the lenses.

96.     On information and belief, Shepard, Johnson, and Freeborn have "bought," and continue to "buy," lenses each year themselves, and claim the same false tax benefits on their own tax returns that their customers claim.

97.     To date, at least 90 people, from Florida, California, Texas, Michigan, and elsewhere across the United States, have claimed bogus tax benefits based on Defendants' abusive solar energy scheme.

98.     Many of Defendants' customers are teachers and/or coaches in secondary schools. Defendants were able to reach at least some of their customers through the customer list for Bigger, Faster, Stronger ("BFS"), Shepard's athletic strength and conditioning programing and equipment company.

99.     Freeborn was a "National Director" of BFS.

100.    Shepard and Freeborn used their positions at BFS to promote their abusive solar energy scheme.

101.    Freeborn promoted the solar energy scheme as a way for coaches to "replace any income [the coach] lost to budget cuts" at their schools and to "fund [the coach's] athletic department."

102.    The IRS has disallowed Defendants' customers' claimed illegitimate tax benefits from the solar energy scheme. Defendants' customers have filed at least 70 cases currently pending in Tax Court. The estimated harm to the United States Treasury from those 70 cases alone is more than $4 million.

**Defendants continue to make false claims about securing tax benefits.**

103.    To the extent the IRS has identified returns filed based on Defendants' abusive solar energy scheme, the IRS has disallowed the false tax benefits that Defendants and their customers claimed.

104.    Since the initiation of the IRS investigation into Defendants' conduct, Defendants have continued to sell their abusive solar energy scheme but have modified how they promote it in order to make the scheme appear legitimate. These modifications are wholly cosmetic, as Defendants continue to operate the scheme as described herein.

105.    Additional tax revenue losses have occurred which the IRS has not yet quantified.

106.    Some of the tax losses from Defendants' abusive solar energy scheme may never be collected, resulting in a permanent loss to the United States Treasury.

107.    Shepard, on behalf of RaPower-3, continues to tell customers that they are entitled to both deduct business expenses (including depreciation on the lenses) and claim § 48 energy credits. He gives customers arguments to support their unlawful claims for tax benefits before the IRS.

108.    Shepard also continues to advocate Defendants' false positions before the IRS. In 2015, and on behalf of RaPower-3, Shepard began addressing letters directly to IRS personnel who were auditing Defendants' customers' tax returns or reviewing their files in the IRS appeals

27

process. In these letters, Shepard maintains that Defendants' customers are entitled to the
depreciation expense deduction and the energy credit they claimed.

109.    In April 2015, Shepard, on behalf of RaPower-3, addressed another letter to "IRS Agents
and Appeals Officers" which states that "[w]e will . . . hold auditors and appeal agents personally
responsible for reckless behavior" if they disallow Defendants' customers' "rightful tax
benefits."

## Defendants' abusive solar energy scheme causes irreparable harm to the United States and to the taxpaying public.

110.    The harm caused by Defendants' abusive solar energy scheme is widespread. The United
States Treasury, Defendants' customers, and the taxpaying public are all adversely affected.

111.    The United States Treasury has suffered losses through tax refunds wrongfully issued and
taxes uncollected. The total amount of wrongful federal tax benefits claimed as a result of
Defendants' abusive solar energy scheme is yet to be fully determined.

112.    Defendants' customers have also incurred direct financial harm because they remain
liable for any unpaid federal tax they owe. They will also be liable for interest that has accrued
on their unpaid federal tax obligations.

113.    Defendants' customers may also be liable for substantial federal tax penalties, which
could include the strict liability 40 percent penalty for underpayment of tax due to a transaction
lacking economic substance which was not adequately disclosed on or with a return.
§ 6662(b)(6), (i).

114.    Moreover, the false information on Defendants' customers' federal income tax returns
may have resulted in those customers filing similarly false state income tax returns. In that event,
Defendants' customers may also have received erroneous state income tax refunds. For example,

28

on October 13, 2014, the Oregon Tax Court determined that Person L and Person M did not establish that they were entitled to the depreciation expense deduction they claimed on their 2010 federal income tax return as a result of participating in Defendants' solar energy scheme (which they also claimed on their 2010 Oregon income tax return). Thus, Defendants' customers may also remain liable for their unwarranted state income tax refunds, interest, and penalties.

115.    Further, the United States has been forced to devote substantial resources to investigate Defendants' abusive solar energy scheme, identify Defendants' customers' proper tax liabilities, and to litigate Defendants' customers' unfounded claims for tax benefits in Tax Court.

116.    The harm caused by Defendants' unlawful conduct has only been compounded by their multi-level marketing model and commission structure, which encourages their customers to recruit additional taxpayers to buy in to the solar energy scheme.

117.    Defendants' abusive solar energy scheme undermines public confidence in the fair administration of the federal tax system and encourages noncompliance with the internal revenue laws, which cause irreparable harm to the United States.

118.    Defendants have been unjustly enriched by operating their solar energy scheme because the scheme relies on an abuse of the federal tax laws.

## INJUNCTION UNDER § 7402(a)

119.    Section 7402(a) authorizes a district court to issue injunctions and to render judgments that may be "necessary or appropriate for the enforcement of the internal revenue laws," even when the United States may have other remedies available for enforcing those laws.

### Count I: Injunction Under § 7402(a) Against RaPower-3

120.  The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

121.  On information and belief, RaPower-3 exists solely for the purpose of promoting the abusive solar energy scheme described herein. It has no lawful purpose.

122.  RaPower-3, through its officers, directors, owners, employees, and/or other agents, made, and continues to make, false or fraudulent statements regarding the law and facts applicable to material matters under the internal revenue laws; facilitated, and continues to facilitate, customers' claims for tax benefits to which they were not entitled; encouraged, and continues to encourage, customers to "sponsor" others into the solar energy scheme; collected, and continues to collect, income from the abusive solar energy scheme; and interfered, and continues to interfere, with the IRS's process of examining customers' tax returns. These actions have substantially interfered, and continue to substantially interfere, with the enforcement of the internal revenue laws.

123.  Unless enjoined, RaPower-3 has shown that it is in a position to, and likely will, continue to engage in such unlawful conduct and to interfere with the enforcement of the internal revenue laws.

124.  The United States will suffer irreparable injury if RaPower-3 is not enjoined.

125.  Enjoining RaPower-3 is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop RaPower-3's illegal conduct and the harm it causes the United States.

30

126. The requested injunction against RaPower-3 is necessary or appropriate to stop its unlawful conduct and this Court should impose such injunctive relief under § 7402(a).

## Count II: Injunction Under § 7402(a) Against IAS

127. The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

128. IAS, through its officers, directors, owners, employees, and/or other agents, made, and continues to make, false or fraudulent statements regarding the law and facts applicable to material matters under the internal revenue laws; facilitated, and continues to facilitate, customers' claims for tax benefits to which they were not entitled; and collected, and continues to collect, income from the abusive solar energy scheme. These actions have substantially interfered, and continue to substantially interfere, with the enforcement of the internal revenue laws.

129. Unless enjoined, IAS has shown that it is in a position to, and likely will, continue to engage in such unlawful conduct and to interfere with the enforcement of the internal revenue laws.

130. The United States will suffer irreparable injury if IAS is not enjoined

131. Enjoining IAS is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop IAS's illegal conduct and the harm it causes the United States.

132. The requested injunction against IAS is necessary or appropriate to stop its unlawful conduct and this Court should impose such injunctive relief under § 7402(a).

31

## Count III: Injunction Under § 7402(a) Against LTB

133. The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

134. LTB, through its officers, directors, owners, employees, and/or other agents, made, and continues to make, false or fraudulent statements regarding facts applicable to material matters under the internal revenue laws; facilitated, and continues to facilitate, customers' claims for tax benefits to which they were not entitled; and may have collected, and may continue to collect, income from the abusive solar energy scheme. These actions have substantially interfered, and continue to substantially interfere, with the enforcement of the internal revenue laws.

135. Unless enjoined, LTB is in a position to, and likely will, continue to engage in such unlawful conduct and to interfere with the enforcement of the internal revenue laws.

136. The United States will suffer irreparable injury if LTB is not enjoined.

137. Enjoining LTB is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop LTB's illegal conduct and the harm it causes the United States.

138. The requested injunction against LTB is necessary or appropriate to stop its unlawful conduct and this Court should impose such injunctive relief under § 7402(a).

## Count IV: Injunction Under § 7402(a) Against Shepard

139. The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

140. Shepard, through his actions described above, including making false or fraudulent statements regarding the law and facts applicable to material matters under the internal revenue

32

laws, facilitating customers' claims for tax benefits to which they were not entitled, encouraging customers to "sponsor" others into the solar energy scheme, collecting "commissions" and/or other income from the abusive solar energy scheme, and interfering with the IRS's process of examining customers' tax returns, has substantially interfered, and continues to substantially interfere, with the enforcement of the internal revenue laws.

141.    Unless enjoined, Shepard has shown that he is in a position to, and likely will, continue to engage in such unlawful conduct and to interfere with the enforcement of the internal revenue laws.

142.    The United States will suffer irreparable injury if Shepard is not enjoined.

143.    Enjoining Shepard is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Shepard's illegal conduct and the harm it causes the United States.

144.    The requested injunction against Shepard is necessary or appropriate to stop his unlawful conduct and this Court should impose such injunctive relief under § 7402(a).

## Count V: Injunction Under § 7402(a) Against Johnson

145.    The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

146.    Johnson, through his actions described above, including making false or fraudulent statements regarding the law and facts applicable to material matters under the internal revenue laws, facilitating customers' claims for tax benefits to which they were not entitled, and collecting "commissions" and/or other income from the abusive solar energy scheme, has

33

substantially interfered, and continues to substantially interfere, with the enforcement of the internal revenue laws.

147.  Unless enjoined, Johnson has shown that he is in a position to, and likely will, continue to engage in such unlawful conduct and to interfere with the enforcement of the internal revenue laws.

148.  The United States will suffer irreparable injury if Johnson is not enjoined.

149.  Enjoining Johnson is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Johnson's illegal conduct and the harm it causes the United States.

150.  The requested injunction against Johnson is necessary or appropriate to stop his unlawful conduct and this Court should impose such injunctive relief under § 7402(a).

## Count VI: Injunction Under § 7402(a) Against Freeborn

151.  The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

152.  Freeborn, through his actions described above, including making false or fraudulent statements regarding the law and facts applicable to material matters under the internal revenue laws, facilitating customers' claims for tax benefits to which they were not entitled, "sponsoring" additional customers into the solar energy scheme, and collecting "commissions" and/or other income from the abusive solar energy scheme, has substantially interfered, and continues to substantially interfere, with the enforcement of the internal revenue laws.

153.  Unless enjoined, Freeborn has shown that he is in a position to, and likely will, continue to engage in unlawful conduct and to interfere with the enforcement of the internal revenue laws.

34

154.   The United States will suffer irreparable injury if Freeborn is not enjoined.

155.   Enjoining Freeborn is in the public interest because an injunction, backed by the Court's
contempt powers if needed, will prevent Freeborn from engaging in illegal conduct and will
prevent harm to the United States.

156.   The requested injunction against Freeborn is necessary or appropriate to stop his unlawful
conduct and this Court should impose such injunctive relief under § 7402(a).

## INJUNCTION UNDER § 7408

157.   Section 7408(a) authorizes a district court to enjoin any person from engaging in conduct
subject to penalty under § 6700 if injunctive relief is appropriate to prevent recurrence of that
conduct or any other activity subject to penalty under the Internal Revenue Code.

158.   Section 6700 imposes a civil penalty on any person who (1) either organizes or assists in
the organization of a plan or arrangement or participates in the sale of any interest in a plan or
arrangement; and (2) makes or furnishes, or causes another to make or furnish, certain
statements.

159.   One such statement subject to penalty is a statement with respect to the securing of a tax
benefit by reason of holding an interest in an entity or participating in a plan or arrangement that
the person knows or has reason to know is false or fraudulent as to any material matter.
§ 6700(a)(2)(A).

160.   Another such statement subject to penalty is a "gross valuation overstatement as to any
material matter." § 6700(a)(2)(B). A gross valuation overstatement is "any statement as to the
value of any property or services" if the value of the property or services is directly related to the

35

amount of any tax deduction or credit and the stated value is more than 200 percent of the correct value of the property or services. § 6700(b)(1).

## Count VII: Injunction Under § 7408 Against RaPower-3

161. The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

162. RaPower-3, through its officers, directors, owners, employees, and/or other agents, organized, or assisted in organizing, the plan described herein to promote false federal tax benefits. RaPower-3 also participated, directly or indirectly, in the sale of interests in the plan to customers and prospective customers. In doing so:

    a.    RaPower-3 made or furnished, or caused another to make or furnish, statements regarding a customer's ability to claim false federal tax benefits, including deductions and credits. RaPower-3 knew or had reason to know these statements were false or fraudulent as to material matters because the facts and law applicable to the tax benefits it promoted – as RaPower-3 knew or had reason to know them – were contrary to RaPower-3's statements in furtherance of its solar energy scheme; and

    b.    RaPower-3 made or furnished, or caused another to make or furnish, gross valuation overstatements as to material matters.

163. RaPower-3's nationwide promotion of its abusive solar energy scheme has reached many customers and many years. It actively encourages customers to spread its abusive scheme to still more people by paying them to "sponsor" others into the scheme.

36

164.    RaPower-3 is undeterred by the IRS's rejection of its abusive solar energy scheme. If the

Court does not enjoin RaPower-3, it has shown that it is in a position to, and likely will, continue

to engage in conduct subject to penalty under § 6700.

165.    The United States will suffer irreparable injury if RaPower-3 is not enjoined.

166.    Enjoining RaPower-3 is in the public interest because an injunction, backed by the

Court's contempt powers if needed, will stop RaPower-3's illegal conduct and the harm it causes

the United States.

167.    The requested injunction against RaPower-3 is appropriate to stop its unlawful conduct

and this Court should impose such injunctive relief under § 7408(a).

### Count VIII: Injunction Under § 7408 Against IAS

168.    The United States incorporates by reference the allegations contained in paragraphs 1

through 118.

169.    IAS, through its officers, directors, owners, employees, and/or other agents, organized, or

assisted in organizing, the plan described herein to promote false federal tax benefits. IAS also

participated, directly or indirectly, in the sale of interests in the plan to customers and

prospective customers. In doing so:

    a.    IAS made or furnished, or caused another to make or furnish, statements

    regarding a customer's ability to claim false federal tax benefits, including deductions

    and credits. IAS knew or had reason to know these statements were false or fraudulent as

    to material matters because the facts and law applicable to the tax benefits it promoted –

    as IAS knew or had reason to know them – were contrary to IAS's statements in

    furtherance of its solar energy scheme; and

37

b.     IAS made or furnished, or caused another to make or furnish, gross valuation

overstatements as to material matters.

170.   IAS's nationwide promotion of its abusive solar energy scheme has reached many

customers and many years. It actively encourages customers to spread its abusive scheme

through RaPower-3.

171.   Unless enjoined, IAS has shown that it is in a position to, and likely will, continue to

engage in conduct subject to penalty under § 6700, resulting in irreparable injury to the United

States.

172.   The United States will suffer irreparable injury if IAS is not enjoined.

173.   Enjoining IAS is in the public interest because an injunction, backed by the Court's

contempt powers if needed, will stop IAS's illegal conduct and the harm it causes the United

States.

174.   The requested injunction against IAS is appropriate to stop its unlawful conduct and this

Court should impose such injunctive relief under § 7408(a).

## Count IX: Injunction Under § 7408 Against Shepard

175.   The United States incorporates by reference the allegations contained in paragraphs 1

through 118.

176.   Shepard organized, or assisted in organizing, the plan described herein to promote false

federal tax benefits. Shepard also participated, directly or indirectly, in the sale of interests in the

plan to customers and prospective customers.

38

177. In doing so,

a.    Shepard made or furnished, or caused another to make or furnish, statements regarding a customer's ability to claim false federal tax benefits, including deductions and credits. Shepard knew or had reason to know these statements were false or fraudulent as to material matters because the facts and law applicable to the tax benefits he promoted – as Shepard knew or had reason to know them – were contrary to Shepard's statements in furtherance of his solar energy scheme; and

b.    Shepard made or furnished, or caused another to make or furnish, gross valuation overstatements as to material matters.

178. Shepard's nationwide promotion of his abusive solar energy scheme has reached many customers and many years. He actively encourages customers to spread the abusive scheme to still more people through RaPower-3.

179. Shepard is brazenly undeterred by the IRS's rejection of his abusive solar energy scheme. If the Court does not enjoin Shepard, he has shown that he is in a position to, and likely will, continue to continue to engage in conduct subject to penalty under § 6700.

180. The United States will suffer irreparable injury if Shepard is not enjoined.

181. Enjoining Shepard is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Shepard's illegal conduct and the harm it causes the United States.

182. The requested injunction against Shepard is appropriate to stop his unlawful conduct and this Court should impose such injunctive relief under § 7408(a).

39

## Count X: Injunction Under § 7408 Against Johnson

183.   The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

184.   Johnson organized, or assisted in organizing, the plan described herein to promote false federal tax benefits. Johnson also participated, directly or indirectly, in the sale of interests in the plan to customers and prospective customers.

185.   In doing so,

a.      Johnson made or furnished, or caused another to make or furnish, statements regarding a customer's ability to claim false federal tax benefits, including deductions and credits. Johnson knew or had reason to know these statements were false or fraudulent as to material matters because the facts and law applicable to the tax benefits he promoted – as Johnson knew or had reason to know them – were contrary to Johnson's statements in furtherance of his solar energy scheme; and

b.      Johnson made or furnished, or caused another to make or furnish, gross valuation overstatements as to material matters.

186.   Johnson's nationwide promotion of his abusive solar energy scheme has reached many customers and many years. He actively encourages customers to spread the abusive scheme to still more people through RaPower-3.

187.   Johnson is undeterred by the IRS's rejection of his abusive solar energy scheme. If the Court does not enjoin Johnson, he has shown that he is in a position to, and likely will, continue to engage in conduct subject to penalty under § 6700.

188.   The United States will suffer irreparable injury if Johnson is not enjoined.

40

189. Enjoining Johnson is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Johnson's illegal conduct and the harm it causes the United States.

190. The requested injunction against Johnson is appropriate to stop his unlawful conduct and this Court should impose such injunctive relief under § 7408(a).

## Count XI: Injunction Under § 7408 Against Freeborn

191. The United States incorporates by reference the allegations contained in paragraphs 1 through 118.

192. Freeborn organized, or assisted in organizing, the plan described herein to promote false federal tax benefits. Freeborn also participated, directly or indirectly, in the sale of interests in the plan to customers and prospective customers.

193. In doing so,

    a.    Freeborn made or furnished, or caused another to make or furnish, statements regarding a customer's ability to claim false federal tax benefits, including deductions and credits. Freeborn knew or had reason to know these statements were false or fraudulent as to material matters because the facts and law applicable to the tax benefits he promoted – as Freeborn knew or had reason to know them – were contrary to Freeborn's statements in furtherance of his solar energy scheme; and

    b.    Freeborn made or furnished, or caused another to make or furnish, gross valuation overstatements as to material matters.

41

194. Freeborn's nationwide promotion of his abusive solar energy scheme has reached many customers and many years. He actively encourages customers to spread the abusive scheme to still more people through RaPower-3.

195. Freeborn is undeterred by the IRS's rejection of his abusive solar energy scheme. If the Court does not enjoin Freeborn, he has shown that he is in a position to, and likely will, continue to engage in conduct subject to penalty under § 6700.

196. The United States will suffer irreparable injury if Freeborn is not enjoined.

197. Enjoining Freeborn is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Freeborn's illegal conduct and the harm it causes the United States.

198. The requested injunction against Freeborn is appropriate to stop his unlawful conduct and this Court should impose such injunctive relief under § 7408(a).

WHEREFORE, Plaintiff, the United States of America, prays for the following relief against Defendants:

a. That this Court, under § 7402(a), enter an order requiring Shepard, Johnson, and Freeborn to advise the IRS through the IRS's designee of any entity (corporation, LLC, LLP, limited partnership, etc.) formed by him or at his direction no later than 30 days from the date of the entity's formation. Notice to the IRS shall include copies of the documents filed with the appropriate authorities to form the entity (*e.g.*, Articles of Incorporation). All principals of any such entity shall be notified of this requirement.

42

b.      That this Court, under § 7402(a), enter an order requiring all Defendants to

disgorge to the United States the gross receipts (the amount of which is to be determined

by the Court) that Defendants received from any source as a result of the abusive solar

energy scheme described herein, together with prejudgment interest thereon.

c.      That this Court, under § 7402(a), enter an order requiring all Defendants to

provide to counsel for the United States, no later than 30 days from the date judgment is

entered, a list identifying any entity (corporation, LLC, LLP, limited partnership, etc.) in

which any Defendant owns an interest, either directly or indirectly through another entity,

or through which any Defendant conducted any business in furtherance of the abusive

solar energy scheme described herein. The list shall include the name of any other person

or entity who owns an interest in an identified entity; the identified entity's taxpayer or

employer identification number; and the registered agent for the identified entity.

d.      That this Court, under § 7402(a), enter an order requiring all Defendants to

provide to counsel for the United States, no later than 30 days from the date judgment is

entered, a list of all persons who, in or since calendar year 2005, have purchased any

tangible property, products, services, or advice associated with the abusive solar energy

scheme described herein, including each person's mailing address, e-mail address,

telephone number, and taxpayer identification number.

e.      That this Court, under § 7402(a), enter an order requiring all Defendants to

provide to counsel for the United States, no later than 30 days from the date judgment is

entered, a list of all persons to whom Defendants have referred customers for the

preparation of federal tax returns pursuant to the abusive solar energy scheme described

herein, including each tax preparer's mailing address, e-mail address, and telephone number.

f.  That this Court, under § 7402(a), enter an order requiring all Defendants to provide to counsel for the United States, no later than 30 days from the date judgment is entered, a list of all persons who have sold any tangible property, products, services, or advice associated with the abusive solar energy scheme described herein, including each person's mailing address, e-mail address, telephone number, taxpayer identification number, and interest or item sold, with quantity sold.

g.  That this Court, under § 7402(a), enter an order requiring all Defendants, no later than 30 days from the date judgment is entered, to contact by mail (and also by e-mail, if an address is known) all persons who have purchased any tangible property, products, services, or advice associated with the abusive solar energy scheme described herein and provide them with 1) a copy of the Court's judgment plus any findings of fact and conclusions of law in support of the judgment, and 2) a copy of the permanent injunction. There shall not be any other document enclosed unless that document is first approved by the United States or by this Court.

h.  That this Court, under § 7402(a), enter an order requiring all Defendants to replace all content on any website they own or maintain for a period of two years with a full copy of the injunction against them.

44

i. That this Court find that all Defendants continually and repeatedly engaged in conduct subject to penalty under § 6700 and, under §§ 7402(a) and 7408, enter an order prohibiting all Defendants and their representatives, agents, servants, employees, and anyone in active concert or participation with them, from directly or indirectly:

 i. promoting, organizing, or selling, directly or indirectly, the abusive solar energy scheme described herein;

 ii. making or furnishing a gross valuation overstatement as to any material matter while promoting, organizing, or selling, directly or indirectly, the abusive solar energy scheme described herein;

 iii. promoting, organizing, or selling, directly or indirectly, any plan or arrangement that promises a federal tax benefit as a result of participating in the plan or arrangement; and

 iv. making or furnishing a gross valuation overstatement as to any material matter while promoting, organizing, or selling, directly or indirectly, any plan or arrangement that promises a federal tax benefit as a result of participating in the plan or arrangement.

j. That this Court, under § 7402(a), enter an order prohibiting all Defendants and their representatives, agents, servants, employees, attorneys, independent contractors, and anyone in active concert or participation with them, from directly or indirectly:

      i.      preparing or filing, or assisting or advising in the preparation or filing of, any federal tax return or amended return, other related documents or forms (including but not limited to IRS Form 3800, IRS Form 4368, IRS Form 4562, and IRS Schedule C), or any other document filed with the IRS, that contain false or fraudulent information;

      ii.     preparing or filing, or assisting or advising in the preparation or filing of, any federal tax return or amended return, other related documents or forms (including but not limited to IRS Form 3800, IRS Form 4368, IRS Form 4562, and IRS Schedule C), or any other document filed with the IRS, for any person or entity other than themselves or an entity in which they own an interest;

      iii.    engaging in any other activity subject to penalty under the Internal Revenue Code; and

      iv.    engaging in other conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

k.     That this Court, under § 7402(a), enter an order prohibiting all Defendants from preparing their own federal tax returns, or the federal tax returns of any entity in which they own an interest, claiming false tax benefits as a result of the abusive solar energy scheme described herein.

l.     That this Court, under § 7402(a), enter an order prohibiting Shepard from representing anyone other than himself before the IRS and prohibiting him from providing materials containing false or fraudulent arguments to any other person to assist them in representing themselves or another person before the IRS.

46

m.      That this Court retain jurisdiction to allow the United States full post-judgment

discovery to monitor Defendants' compliance with the injunction.

n.      That this Court grant the United States such other and further relief as the Court

deems just and proper, including awarding the United States its costs and expenses

incurred in this suit.

Dated: 23 November 2015

> JOHN W. HUBER
> United States Attorney
>
> /s/ John K. Mangum
> JOHN K. MANGUM
> Assistant United States Attorney
>
> ERIN HEALY GALLAGHER
> DC Bar No. 985670
> ERIN R. HINES
> FL Bar No. 44175
> CHRISTOPHER R. MORAN
> NY Bar No. 5033832
> Trial Attorneys, Tax Division
> U.S. Department of Justice
> P.O. Box 7238
> Ben Franklin Station
> Washington, D.C. 20044
> Telephone: (202) 353-2452
>
> *Attorneys for the United States*